## FISHWICK's Adm'r. vs. SEWELL.

JUNE.

In an action of trover, brought by an administrator for the conversion of certain negro

APPEAL from *Prince-George's* County Court. An action of trover was brought on the 15th of June 1812, for the

slaves, the declaration stated that J F, the intestate, died possessed of a negro woman named *Dinah*, in 1765; that *Dinah* and her issue came to the possession of the defendant, and that administration was granted to the plaintiff on the estate of J F in 1812. The county court directed the jury, that from the evidence in the cause, if they found it to be true, they might and ought to presume, that if *Dinah* ever was the property of J F, she was legally transferred to the defendant, or those under whom he claimed. On appeal—Held, that such evidence was sufficient to account for the delay which took place before the issuing the letters of administration to the plaintiff, and to repel the presumption that *Dinah* was legally transferred to the defendant, or those under whom he claimed.

No right of action vested in any person to sustain an action of trover for *Dinah*, and her descendants, before letters of administration were granted to the plaintiff. The act of limitations could not begin to operate before such letters were taken out, and did not attach until demand and refusal.

An additional account returned to the prerogative court in 1755 by R D, (under whom the defendant claimed *Dinah* and her issue,) who had intermarried with the mother of J F, and who was the executrix of the father of J F, certified by the register of wills under seal, permitted to be read in evidence.

1818.

Fishwick
vs
Sewell

*Where the evidence and length of time did not warrant the presumption that R D, with the assent of the persons entitled to distribution of the estate of J F, took upon himself the executorship, and fully administered all the assets of J F, by paying debts, &c. to the value of such assets*

*The plaintiff is entitled to recover damages to the amount of the value of Dinah, and her descendants, together with damages for the detention from the time of the demand and refusal, proved*

*Certain facts declared to be inadmissible as evidence, the direct tendency of which was to impeach and nullify the letters of administration granted to the plaintiff, by showing that they were not granted by the Orphans court, but by a deputy clerk in the office of the register of wills, to whom the court could not delegate any such authority—Held, that such letters were legally efficient, until revoked, being clothed with all the requisite legal solemnities to communicate power and authority to the plaintiff to administer on the estate of J F.*

*Held also, that a claim against the estate of J F, paid by R D, could not be recouped from the damages for the conversion of the negroes claimed by the plaintiff*

*A trustee cannot avail himself of the act of limitations against his cestui que trust.*

value of certain negro slaves, and a spinet. The declaration contained two counts. The *first* stated, that *Jane Fishwick*, in her life-time, on the 1st of January 1765, was possessed of the following negroes, to wit: *Dinah*, of the price of $300; *Fanny*, of, &c. [*Enumerating 17 other negroes, and their prices.*] And also one spinet the value of, &c. as of her own proper goods and chattels; and being so possessed thereof, afterwards, on the 1st of March in the said year, died intestate; after whose death the said property came to the hands and possession of the defendant, (now appellee.) And afterwards on the 6th of May 1812, administration of all and singular the goods, &c. which were of the said *Jane* at the time of her death, was by the Orphans Court of *Prince George's* county aforesaid, in due form of law granted to the plaintiff, (now appellant;) and the defendant, although he very well knew the said property was the property of the said *Jane* in her life-time, and at the time of her death, and of right to belong to the plaintiff after the decease of the said *Jane*, by reason of said administration, nevertheless contriving, &c. [Setting out the demand and conversion, &c.] The *second count* stated, that the said *Jane* in her life-time, to wit, on the 1st of January 1765, was also possessed of the following property, to wit, a negro woman named *Dinah*, of the price of, &c. and a negro woman named *Fanny*, of, &c. as of her own proper goods and chattels; and being so possessed thereof, afterwards, to wit, on the 1st of March in the last mentioned year, departed this life intestate. And whereas the said *Dinah*, after the death of the said *Jane*, and before the granting of any letters of administration to the plaintiff, had issue, to wit, *Phillis*, of the price of, &c. which said negroes named *Phillis*, &c. the proper goods and chattels of the said *Jane*, together with the said *Dinah* and *Fanny*, came into the hands and possession of the defendant after the death of the said *June*. And afterwards, &c. [Setting out the administration granted to the plaintiff, the demand and conversion, &c.] The defendant pleaded not guilty, and not guilty within three years, &c. At the trial in the county court at April term 1814, the plaintiff, to prove property in the negroes mentioned in the declaration, offered in evidence the depositions of sundry witnesses, which it was agreed between the parties should be read in evidence, so far as they were competent and legal testimony. 1. *Eleanor Clagett*. She deposed that she knew *Jane Fishwick*, and that she lived in the family of *Robert Darnall*, deceased, and the deponent believed died there; that she saw her there when she was sick, a few days before her death. She knew a female slave named *Dinah*, said to be in the possession of the defendant. That *Dinah* was called and considered by the family of the late *R. Darnall* the servant of Miss *Fishwick*, and she waited on her in her room as her servant, but how or in what manner she claimed or owned the said servant, the deponent did not know. That she

was intimate in the family of *R. Darnall.* That she was not with Miss *Fishwick* at the time of her death, and knew nothing in regard to her funeral expenses. 2 *Hannah West.* She deposed that she knew a female slave named *Dinah*, in the possession of the defendant. She did not know who was the owner of *Dinah*, but she came over from the *Eastern Shore* with *R. Darnall*, and his wife. That Miss *Fishwick* lived with *R. Darnall*, deceased, and died at his house. 3. Doctor *William Beanes*. He deposed that he was acquainted with Miss *Fishwick* when she was from the age of 12 or 13 years, to about 20 years or upwards; she resided with *Robert Darnall* and wife, and was upwards of twenty years of age when she died, which was about the year 1775. He knew negro *Dinah* who resided in the family of *R. Darnall.* Since Miss *Fishwick's* death he heard it frequently said, and probably in the family, that *Dinah* was the slave of Miss *Fishwick.* To the best of his recollection he had heard the defendant say that Mr. *Darnall* had written to Mr. *Muir* to take the property, and pay the debts due from Miss *Fishwick*, stating that the debts due to Mr. *Darnall* were more than the value of the property, but that he received no answer from Mr. *Muir.* He never heard of any other property, but negro *Dinah*, in *Darnall's* possession, that belonged to Miss *Fishwick*; that he held her as his own. The deponent's inference, from his casual conversation with the defendant, the very words and particulars of which he could not recollect, was that the defendant claimed her on account of the debts due Mr. *Darnall* from Miss *Fishwick.* That from a conversation he had with the defendant, the defendant informed him, that Mr. *Darnall*, when he heard that some claim was set up by Mrs. *Hepburn* to negro *Dinah*, told him that probably some claim might be set up after his death, that he had as much right to negro *Dinah* as to any other property on his plantation, without stating any reason or foundation for the claim. This deponent further saith, that Miss *Fishwick* was the daughter of Mrs. *Darnall*; that Miss *Fishwick* had no brother or sister of the whole blood, but a half brother, a Mr. *Nevitt*, the father of a Mrs. *Steele*, and two half sisters, Mrs. *Green* and Mrs. *Muir*, who were older than Miss *Fishwick*, but the deponent did not know whether they were living or not at the time of Miss *Fishwick's* death. That he was not intimate in the family of Mr. *Darnall* until after the death of Miss *Fishwick.* He never heard the defendant say or pretend that Miss *Fishwick* gave *Dinah* to Mr. *Darnall* or her mother. The inference he drew from the conversations he had with the defendant, was that the claim of Mr. *Darnall* was founded on what Mr. *Darnall* claimed from Miss *Fishwick*, but he never heard positively on what ground, Mr. *Darnall*, or the defendant, claimed *Dinah.* That ever since he knew *Dinah*, during the life of Mr. *Darnall*, she was held by him as his property; and she, and her descendants, have

been in the possession of the defendant, and held by him as his property, ever since the death of Mr. *Darnall*. He has heard that Mr. *Darnall* acquired considerable property by his intermarriage with Mrs. *Darnall*. 4. *Richard Burgess*. He deposed, that at the request of the plaintiff he delivered the defendant a written demand for sundry negroes, claimed by the plaintiff as administrator of Miss *Fishwick*, in the possession of the defendant, of which a copy of a letter, now shewn to him, was a true copy, dated the 15th of June 1812, among which negroes was a negro woman by the name of *Dinah*, who he thinks the defendant said was the mother or grand-mother of all the others claimed, except one, and which the deponent believes was a female, whose name he does not now recollect. That the defendant refused to deliver said negroes, and denied all claim that the plaintiff had thereto. That the defendant, at the same time desired him to tell the plaintiff that he had no property of Miss *Fishwick's* in his hands. The plaintiff also produced as a witness Dr. *William Hill*, who deposed that the defendant had declared to him, (during conversations he had about the claim set up by the *Hepburns* in right of Miss *Fishwick* to the negro woman *Dinah*,) that the said *Hepburns* had been talking about and claiming *Dinah* a long while; that his uncle, meaning *Robert Darnall*, had a claim against the plaintiff's intestate; but the witness had never heard the defendant say that negro *Dinah*, in the declaration mentioned, was the property of the plaintiff's intestate; and that the defendant also said, in conversations about the claim of the *Hepburns* to *Dinah*, that his uncle *Robert Darnall* had claims against the estate of Miss *Fishwick* which would cover the whole of the property left by her. That the *Hepburns* had no right to *Dinah*, but even if they had a right to her it was barred by the statute of limitations. That the defendant had told the witness that a certain *Samuel J. Coolidge*, who had intermarried with the daughter of Mrs. *Jane Hepburn*, one of the legal representatives of the plaintiff's intestate, had set up a claim to negro *Dinah*, and her descendants, and that a claim had also been set up by the said *Jane Hepburn* some years since, but that they had no title; and that *Coolidge* told the witness that he had thoughts of instituting a suit against the defendant, but he found he could not substantiate his claim, and besides, the property, if recovered, would be divided amongst so many that it was not of much consequence. The plaintiff also proved, by a competent witness, that negro *Dinah*, mentioned in the declaration, had seven children, to wit, *Fanny*, *Patt*, &c. named in the declaration, all of whom were living, and were born after the death of the plaintiff's intestate; that *John*, &c. are the children of *Fanny*; that *Isaac*, *Nancy*, &c. are the children of *Patt*; and that *Harriott* is the daughter of *Nancy*, who is deceased, and who was the daughter of *Dinah*. The plaintiff also offered in evidence, by the

aforesaid *Richard Burgess*, that he the witness called on the defendant, and by the following letter from the plaintiff to the defendant, dated the 15th of June 1812, demanded the negroes mentioned in the declaration, viz. "I am authorized by the orphans court of *Prince-George's* county, as administrator of Miss *Jane Fishwick*, late of said county, deceased, to ask and demand of you her personal estate, consisting of the following property, to wit, *Dinah*, *Fanny*, *Phillis*, *John*, *Paul*, *Moses*, *Susannah*, *Pat*, *Isaac*, *Charles*, *Nelly*, *Sally*, *John*, *Sampson*, *Tom*, *Nancy*, *Kit*, *Anna* and *Harriott*, and one spinet, and any other property which you may have in your possession belonging to said Miss *Fishwick*, and to inform me by Mr. *Richard Burgess* in writing, whether you will deliver them, and if not, your reasons for detaining them." Among which negroes was negro *Dinah*, whom the witness thinks the defendant said was the mother or grandmother of all the others claimed, except one, which the witness believed was a female, but her name he did not recollect. That the defendant refused to deliver said negroes, and denied all claim that the plaintiff had thereto. That the defendant, at the same time desired the witness to tell the plaintiff that he had no property of Miss *Fishwick's* in his hands. The witness did not recollect that the defendant told him that he had an account against Miss *Fishwick* which would swallow up the whole of the estate left by her in his possession. That the defendant said, (speaking on the subject of his claim,) that the expenses of the funeral would amount to more than the value of the property. The plaintiff also offered in evidence by *John Smith Brookes*, who deposed that *Samuel Hepburn*, the father of the plaintiff, was born and lived all his life in the neighbourhood of *Robert Darnall's* residence in *Prince George's* county, and was one of the commissioners of the tax for said county, and also clerk to the commissioners of the tax at the time that *Darnall* was one of the commissioners. That Mrs. *Darnall*, at the time of her marriage with Mr. *Darnall*, was much older than he was, and was reputed very rich, and it was generally believed that he had acquired considerable property by the marriage. That Mr. *Darnall* had no children by Mrs. *Darnall*. That Mr. *Coolidge* married a sister of the plaintiff, a daughter of *Jane Hepburn*, (who is yet living,) who was married between the age of eighteen and twenty one years, and resided in *Prince-George's* county from the time of her marriage until one or two years ago. That *Samuel Hepburn*, died seven or eight years ago. It was proved by the records of the commissioners of the tax for *Prince George's* county, that *Samuel Hepburn*, stated to have married *Jane Hepburn*, (who was the daughter of Mrs. *Muir*, who was proved by Doctor *Beanes*, in his deposition, to have been one of the half sisters of *Jane Fishwick*,) was a commissioner of the tax for the said county, from the year 1786 till 1789, and acted as such; and from 1790 until his death, was the clerk

1818.

Fishwick
vs
Sewell

to the commissioners of the tax for said county, and acted as such. The defendant proved by *Joshua Peake*, a witness produced and sworn by the plaintiff, that he the witness was overseer for *Robert Darnall* seventeen years ago, and continued his overseer until his death, which happened in 1803, and that he has ever since been acting as overseer for the defendant, to whom the said *Darnall*, by his will devised the estate superintended by the witness; that when he went upon the farm, *Dinah*, and such of her descendants before named as were born, were on the farm, were considered the negroes of said *Darnall*, were claimed and used by him as his own property, and continued in his use and possession until his death; that until his death they were assessed to said *Darnall*, who paid the county charges on them; and all of said negroes that were born before the death of *Darnall* were always considered, claimed and used by him as his own property. That upon the death of *Darnall*, those negroes were taken possession of by the defendant as his property, claiming the same under the will of *Darnall*, and the defendant has ever since had the use and undisturbed possession of the negroes, and of all their issue born since the death of *Darnall*. That ever since the death of the latter the whole of the negroes have been assessed to, and the taxes paid by the defendant. The plaintiff then gave in evidence the letters of administration granted to him by the orphans court of *Prince-George's* county, on the estate of *Jane Fishwick*, dated the 6th of May 1812; and proved by the testimony of *Trueman Tyler*, register of the orphans court, that it did not appear from the records and papers in his office, that letters testamentary or of administration were ever before granted to any other person on that estate. The defendant then prayed the opinion of the court, and their instruction to the jury, that upon the evidence so offered and delivered, the jury may and ought to presume that *Robert Darnall*, in his lifetime, and the defendant claiming under him, and holding the slaves in question, held the same by a valid and sufficient title. And the Court, [*Johnson*, Ch. J. and *Key*, A. J.] were of opinion, and so directed the jury, that from the facts and circumstances stated, if the jury find them to be true, they might and ought to presume, that if the negro woman named *Dinah*, in the statement mentioned, ever was the property of the plaintiff's intestate, that she was legally transferred to the defendant, or to those under whom he claims, and that the plaintiff, on these facts and circumstances, cannot support this action. The plaintiff excepted; and the verdict and judgment being against him, he appealed to this court.

The cause was argued at December term 1815, before CHASE, Ch. J. and NICHOLSON, EARLE and MARTIN, J.

*Martin* and *F. S. Key*, for the Appellant, referred to 2 *Saund*, 175, (notes.) *Mundell's Lessee vs. Clerklee*, 3 *Harr. & Johns.* 462; and *Cockey's Lessee vs. Smith*, Ibid 20.

*Pinkney* and *Magruder*, for the Appellee, cited *Eldridge vs. Knott*, 1 *Cowp.* 215; and *Carroll, et al. Lessee vs. Norwood*, 4 *Harr. & M'Her.* 288.

CHASE, Ch. J. delivered the opinion of the court. The court are of opinion, that the facts proved in this case on the part of the plaintiff, are sufficient to account for the delay which took place before the issuing the letters of administration to the plaintiff, and do repel the presumption that negro *Dinah* was legally transferred to the defendant, or those under whom he claims, and think the court below erred in directing the jury that they may and ought to make such presumption if they should find the facts and circumstances stated in the bill of exceptions to be true.

The opinion of the court is grounded on the fact that negro *Dinah* had been the property of *Jane Fishwick*, and there is no proof that *Jane Fishwick* was capable, at any time preceding her death, of making a legal transfer of *Dinah*; but the fair and necessary inference from the proof is, that she was a minor at that time. The claim set up by *Darnall*, or the defendant, to *Dinah*, seems to have originated subsequent to the death of *Jane Fishwick*, and was founded on the right to be reimbursed a claim he had against her, and for the money expended in burying the intestate, which in the most forcible manner resisted the presumption of a legal transfer. The small value of *Dinah* at the time of *Jane Fishwick's* death—the number of the representatives—their situation and distance from the place where *Jane Fishwick* died, and the bar set up by the defendant under the act of limitations, account satisfactorily for the delay on taking out letters of administration, and combined with her incapacity to make a legal transfer, and the nature of the claim of right set up by the defendant, resists conclusively the presumption arising from the great length of uninterrupted possession, the payment of the assessment, and supposed acquiescence.

JUDGMENT REVERSED, AND PROCEDENDO AWARDED.

A new trial was afterwards had in the county court under the *procedendo*, at September term 1816.

1. The plaintiff offered in evidence the depositions of the witnesses, and the testimony by him offered in evidence at the former trial, and which are before stated. He also offered in evidence the following letter, proved to have been written by *Robert Darnall*, mentioned in the deposition of Doctor *William Beanes*, dated the 28th of June 1782, viz. "Yours of the 13th of May was this instant delivered to me by Mrs. *Hepburn.* The estate of Miss *Fishwick*, I have been ever ready (and am so still,) to deliver up to any person that will take out letters on it; he or they paying me my account against that estate. You will be pleased to observe, that exclusive of my claim, I am enti-

tled to a child's part of the personal estate. If you doubt this, I would have you satisfy yourself in this particular before you come over, by taking the advice of counsel, as I have already done. God be praised, we can do very well ' without *Dinah;* her work has not been equal to the charge of maintaining four small children. I think, as you do, that the estate has been long unsettled, and that it is high time something was done in it. If it is delayed any longer than this fall, I myself must do something in it, for my own justification." The plaintiff further proved, that the several negroes mentioned in the declaration, except *Dinah,* were the descendants of *Dinah,* mentioned therein and in the depositions given in evidence, and were born after the death of *J. Fishwick,* and that they and *Dinah* were held by *R. Darnall* in his life-time, and until his death, and by the defendant since his death. He also gave in evidence the will of *R. Darnall,* dated the 20th December 1801, constituting the defendant his executor and residuary legatee; and proved that the said negroes were, at the time of *Darnall's* death, in his possession, and with the other property were taken into the possession of the defendant, who has ever since held them in his possession. He also offered in evidence the will of *Ann Loockerman,* dated the 2d of June 1755, bequeathing to her niece *Jane Fishwick,* the child her negro wench *Dido* went with, be it boy or girl, to her and her heirs forever. Also the will of *William Fishwick,* dated the 20th of January 1753, bequeathing to his daughter *Jinny Fishwick* £250, and devising his whole estate, both real and personal, to his wife for life, and after her death to his daughter *Jinny,* and the heirs of her body lawfully begotten, &c. and constituting his wife his executrix. He also offered in evidence an additional account returned to the prerogative court by *R. Darnall,* who had intermarried with the executrix of *W. Fishwick,* dated the 21st of May 1755, charging themselves with the balance of a former account passed by the executrix on the 22d of May 1754, amounting to 2952 lbs. of tobacco, and £3551 18 1 currency, also with sundry sums of money and tobacco since received, amounting, together with the above balance, to 8805 lbs. of tobacco, and £3964 13 4 currency, and claiming credits for payments, disbursements and commission, amounting to 1504 lbs. of tobacco, £352 6 11 sterling, and £57 7 6 currency. He also proved, that *Dinah,* in the declaration named, was the slave *Dinah* mentioned in the deposition of *E. Clagett,* and in the letter of *Darnall,* as the property of *J. Fishwick.* The defendant then gave in evidence, by the testimony of *T. Tyler,* that the witness heard a conversation at various times between *S Hepburn,* (father of the plaintiff, who departed this life before the granting of the letters of administration to the plaintiff,) and the wife of said *Hepburn,* on the subject of the claim of the representatives of *J. Fishwick* to *Dinah,* and that the said *Hepburn* declined administering on her estate, and gave as reasons for declining, the

number of the parties interested in her estate, the small value of the property, the expense of getting out letters of administration and bringing suit for the property; that he had no money to spare for such expenses; the claims of Mr. *Darnall* on the estate, and the statute of limitations, which would bar the claim of her representatives to her property. He then gave in evidence sundry letters from *J. Muir*, the husband of *S. Muir*, who was one of the half sisters of *J. Fishwick*, and the person to whom the aforementioned letter of *Darnall* was addressed, viz. one dated the 7th of January 1775, "I am informed by your letter that Doctor *Digges* has proved his account against *Jane Fishwick*, deceased, and impatient for his money, which he or you shall have as soon as opportunity serves to send it to Doctor *Murray* in *Annapolis*, provided you have not already administered, which I am told there is not any occasion for, as the parties are all of age excepting *P. Nevitt*, and Doctor *Murray* represents her as guardian. Please write me on your receiving of this whether you have administered or not, and by that time I expect to receive a letter from Doctor *Murray*, to whom I have written on the subject." Another dated the 13th of May 1782. "The little estate of Miss *Jane Fishwick*, that is her negroes, &c. has a long time lain unsettled, although Doctor *Murray* has often been applying to me requesting that I would administer on it. The great distance, and perhaps not being able to get security as a stranger, and knowing that Mrs. *Darnall* could not do without *Dinah*, has been the occasion of the long delay. To remedy which have spoken to Mr. *Hepburn* to have something done in it, which if he declines, must endeavour to come over; previous to which should be glad you would inform me by letter, what you propose doing." Another dated the 5th of May 1786. "You say as for the small estate of Miss *Fishwick* you have paid it long since agreeably to my letter. Should be glad to know by first opportunity to whom it has been paid; if it has, there has never been any thing yet received by your humble servant." The defendant then also gave in evidence, the following account, claimed by *Darnall* in his life-time, against the estate of *J. Fishwick*, and copied from *Darnall's* books, viz.

"Dr. The estate of *Jane Fishwick*,    Contra.    Cr.
To paid Doct. *Digges*, account proved,    29  9 6
To cash paid Doctors *Scott* & *Murray* for a visit,   6  0 0
To funeral expenses,    10 0
To one fourth part of said wench and child,   20  0 0
To your board and education, &c. for 20 years.
To interest till paid.

Cr.
1775. By one mulatto wench called *Dinah*, with
       a child at her breast, value,    80  0 0
      E. E.    p.    R. Darnall."

He also read in evidence the deposition of *Patrick Sim*, who deposed that *J. Fishwick* was the daughter of Mrs. *Darnall*, wife of *R. Darnall*. That he thinks Miss *Fishwick*

died in 1774. He sailed for *England* in September of that year, and he thought she died a little before. He understood she was dependent upon her step-father and her mother for her support. He also offered in evidence the account of Doctor *Digges*, and the payment thereof by *Darnall* on the 12th of September 1775; and proved by *T. Tyler*, that all the negroes in the possession of the defendant had been for many years past, ever since the death of *Darnall*, assessed to him by the commissioners of the tax for *Prince-George's* county, and the assessments paid by him; but the assessment lists did not specify or contain the names of the slaves assessed. The defendant then prayed the court to give the following instruction and opinion to the jury: If the jury should be of opinion from the testimony offered to them, that shortly after the death of the plaintiff's intestate, *Darnall* took possession of negro *Dinah*, and such of her children as were then born, claiming a right to hold them on account of claims which he had against the estate, and debts due from the estate, and paid by him after her death, and refusing to deliver them up, except upon payment of said claims; and that the said claims, and *Darnall's* refusal to deliver up the property, were made known to the representatives of the plaintiff's intestate as early as the year 1782, and that after that time *Darnall* claimed, held and used the said negroes as his own, denying all title of the representatives of the deceased to the said negroes, or any of them; and that he continued to use and exercise every act of ownership over the negroes until the time of his death, which happened in the year 1803; and that after his death the defendant, who was his residuary legatee, took possession of *Dinah* and the whole of her issue, held and used them as his property, denying all title of any person claiming under *J. Fishwick*, and that he had the peaceable and undisturbed possession of the said negroes in manner aforesaid, from the year 1803 until the demand proved to have been made by the plaintiff, that then the plaintiff cannot recover any damages under the second issue joined for the conversion of *Dinah* and her issue. But the Court, [*Key* and *Plater*, A. J.] refused to give this instruction to the jury. The defendant excepted.

2. The plaintiff then offered in evidence the account hereinbefore mentioned to have been returned to the prerogative court by *R. Darnall*, who had married the executrix on the estate of *W. Fishwick*, certified under seal by the register of wills of *Dorchester* county. To the admission of which account in evidence the defendant objected. But the Court, [*Johnson*, Ch. J. and *Key* and *Plater*, A. J.] overruled the objection, and admitted the account to be given in evidence. The defendant excepted.

3. The defendant then prayed the opinion of the court and their direction to the jury, that if they found the evidence

1818.
Fishwick
vs
Sewell

to be true, as well on the part of the plaintiff as of the defendant, that then they might presume from such evidence, that *Darnall*, with the assent of the persons entitled to distribution of the estate of *J. Fishwick*, took upon himself the executorship, and fully administered all the assets of the said *J. Fishwick* by paying debts and funeral charges to the value of such assets, and that the plaintiff was not therefore entitled to recover. Which opinion the Court, [*Key* and *Plater*, A. J.] refused to give. The defendant excepted.

4. The defendant then prayed the opinion of the court to the jury, that if the jury found the evidence to be true, that then the plaintiff was not entitled to recover against the defendant the value of *Dinah* and all her descendants named in the declaration. This opinion the Court, [*Key* and *Plater*, A. J.] refused to give. The defendant excepted.

5. The plaintiff offered in evidence under the second issue joined, the letters of administration granted to him as hereinbefore set forth; and offered to prove by *T. Tyler*, register of wills for *Prince-George's* county, that it did not appear from the records and papers in the office of the orphans court of the said county, that letters testamentary or of administration were ever granted to any other than the plaintiff on the estate of *J. Fishwick*. The witness further proved that he had not found in the course of his researches that any summons was ever issued to any of the representatives of *J. Fishwick* to appear and take out letters on the said estate, or that any notice was given to them of any application by the plaintiff, or any other person, for letters of administration on the said estate. That the witness had been in the office of register of wills for the said county as a deputy, or as register, for the last twenty years, and was confident that no summons had within that time been issued for the representatives or any creditor of *J. Fishwick* to appear and take out letters of administration, or any notice given them of any application for such letters by the plaintiff. That letters of administration were granted to the plaintiff by one of the deputies in the office, during the recess of the court, and in the absence of the witness. The defendant then swore *J. Burch*, the deputy who had granted the said letters, who stated that the said letters were granted by him in the recess, and without the authority of the orphans court made known to him by the court in that particular case, but according to the usual practice of the office, which practice was known to and approved by the court. And the records of the court were produced, whereby it appeared that the said court was not in session on the day of issuing of the said letters of administration to the plaintiff, and it did not appear that any application for said letters was made to the said court; but the plaintiff had applied to the register, during the recess of the court, some weeks before the granting the same, for

letters of administration on the said estate. The defend-ant objected to the admissibility of this evidence under the second issue joined. But the Court [*Johnson,* Ch. J. and *Key* and *Plater,* A J.] were of opinion that the said evidence, and the said letters of administration, were admissible, and allowed the same to be given in evidence under the second issue joined. The defendant excepted.

6. The defendant then offered in evidence the account or claim of Doctor *Digges* against *J. Fishwick* before mentioned, and proved that the amount thereof was paid by *Darnall* on the 12th of September 1775. He also offered other evidence to prove to the jury the payment by *Darnall* of other claims against the estate of *J. Fishwick;* and then prayed the court to instruct the jury, that it was competent to them to recoupe in damages, the amount of such payments made by *Darnall* to the creditors of *J. Fishwick,* so far as the jury were satisfied that such payments had been made by *Darnall.* But the Court, [*Johnson,* Ch. J. and *Key* and *Plater,* A. J.] refused to give this instruction, and were of opinion that no such discounts could be admitted, or any deduction from the damages for the conversion of the property claimed in the declaration could be made by the jury. The defendant excepted; and the verdict and judgment being against him, he appealed to this court.

The cause was argued at the present term before CHASE, Ch. J. and BUCHANAN, EARLE, MARTIN, and DORSEY, J.

*Magruder,* for *Sewell* the Appellant. On the *first* bill of exceptions. The evidence stated shows a total abandonment of the property, and no steps taken to recover the negroes on the part of the plaintiff, or those interested therein, for upwards of 30 years. The question is, whether the possession of the property will not avail the defendant under his second plea? The ground of the action is conversion of the property, and the plea of limitation commenced when the conversion took place. *Darnall* was guilty of a conversion in the act of taking possession of the property. If he was guilty then, he was the moment he set up a title to it in 1786. But if his possession was lawfully acquired, his subsequent claim of the property was the conversion of which the plaintiff complains. He cited 6 *Bac. Ab.* tit. *Trover,* (B,) 679. *Bristol vs. Burt,* 7 *Johns. Rep.* 254. There can be no doubt but that *Darnall* was guilty of a conversion in his life-time. The defendant took possession in 1803, and has always since claimed the negroes as his own property. And as more than three years have elapsed from that time, the plaintiff cannot recover. The replication to the defendant's plea of limitation, is general, saying that three years had not elapsed when the suit was brought. The plea has been supported by the defendant, and it is a complete bar to the

1818.

Fishwick
vs
Sewell

plaintiff's action. But it will be said that there was no administration on the estate, and that until there was a demand made by the administrator there could be no limitation. Where the party is rightfully in possession of property, then a den and and refusal are necessary to constitute a conversion; but if the possession is unlawful, no demand is necessary; and a demand and refusal, in such a case, would not avail the plaintiff. From the time of taking illegal possession, limitations commenced, because the conversion arose on the unlawful possession. But it may be said that this case is an exception from the general law on this subject, because here there was no administration. There are, it is true, exceptions to the plea of limitations, as in the cases of infancy, non-residents, &c. if the party takes advantage of the exception, but not otherwise. This case by the replication is not put upon the ground as to the time when the letters of administration were granted, so as to take the case out of the statute. The plaintiff should have replied specially what he intended to rely on. In the cases of infancy, &c. the replications are special where the exceptions in the statute are relied upon. Here there has been an abandonment of the property for more than 30 years; and after every person, who could have any knowledge of the facts, have ceased to exist, this claim has been brought forward, and has been made by a volunteer. If there is any case to which limitations should apply, it ought to apply to this. There was always a person answerable to the creditors of the deceased. For taking it upon the ground that there was no rightful administration, *Darnall*, by taking possession of the property, made himself executor *de son tort*. He could have been compelled to settle up the estate. He was an executor for every purpose except that of bringing actions. 4 *Bac. Ab.* tit. *Limitation of Actions*, (E 5,) 479. *Curry vs. Stephenson*, 2 *Salk.* 421. S. C. *Carth.* 335; and *Webster vs Webster*, 10 *Ves.* 93.

On the *second* bill of exceptions. It is not stated for what purpose the account contained in this exception was given in evidence. It could have been but for the illegal purpose of inflaming the damages to be recovered.

On the *third* bill of exceptions. There was strong presumption that *Darnall* acquired a good title to the negroes. His uniform and undisturbed possession, and that of the defendant for near 40 years, and no satisfactory account given why the claim now set up was not before made, are conclusive circumstances to show a good title. The defendant was not bound to show how he came by the property. If his long possession, and the possession of *Darnall* under whom he claims, are not sufficient to protect him in his possession, there is no security for property; and if he is not entitled to the presumption of having a good title, no person can be secure in his property, no matter how long he may have had possession of it. Length of possession strengthens a man's title to property; and here has

been a sufficient foundation laid whereon to presume a title. Acts of parliament, grants, deeds, &c. are always presumed for the purpose of quieting possession; and if so, why not in this case presume that a valid transfer of the property had been made to *Darnall.* Evidence of the title to property of this description need not be put upon record, and there is consequently a stronger ground to let in presumption here than where a party is bound to place his title on record. 1 *Fonbl.* 319, (and *note* )

On the *fourth* bill of exceptions. As the descendants of *Dinah* were born after *Darnall* had taken possession, and some of them a short time before the suit was brought, and *Darnall,* and the defendant, had been at considerable expense in raising them, the value of the negroes to be recovered should be their value at *the time of the conversion.* The party cannot postpone his suit until the property becomes valuable, and recover the value at any time after the conversion. An action of trover is for damages for the tort by the conversion committed of the thing. Suppose *Dinah* had died in the possession of *Darnall,* suit might be brought for her value when she died. Taking the conversion in 1786, then the damages are to be for the value of the negroes at that time. *United Insurance Company vs. Robinson,* 2 *Caine's Rep.* 280.

On the *fifth* bill of exceptions. The letters of administration granted to the plaintiff in 1812, were offered in evidence under the issue joined on the plea of limitations, although they were not relied on in the replication to that plea. There was no summons for, or notice given to, the representatives of *J. Fishwick,* to appear and take out letters; but they were obtained by the plaintiff without notice or summons, from one of the clerks in the office in vacation. There was no evidence offered that the orphans court approved of the letters being so granted, except a general order authorising the register to grant letters in all cases when applied for. To defeat the plea of limitations these letters were produced, to show a recent demand after they had been granted, and that limitations did not begin to run until 1812. This was not necessary, unless it be the law that a demand and refusal constitute a conversion. But the letters were granted to the plaintiff without any authority. He did not stand in the character of a creditor, or as a representative of the deceased, so as to entitle him to demand the letters. He obtains them without the sanction of the court or even of the register.

On the *sixth* bill of exceptions. The jury might recoupe in damages; that is deduct the amount of what *Darnall* and the defendant had paid on account of Miss *Fishwick,* and for their claim against her estate. *Bull. N. P.* 48. *Toller,* 365. 3 *Bac. Ab.* tit. *Executors, &c.* 25. *Witehall vs. Squire, Carth.* 104.

*Jones,* (District Attorney of *Columbia,*) on the same side. As to the act of limitations, relied on in the *first* bill of ex-

ceptions, which he stated was an original question, he said
he intended to rely, in addition to the authorities cited,
upon *Went. Off. Ex'r.* 49, in the original, and 125 in the
supplement, where the doctrine of relation is treated of.
As to the presumption relied on in the *third* bill of exceptions,
he cited 1 *Phill. Evid.* 119, and the authorities referred
to.   On the *fourth* bill of exceptions, *Leach vs. Slater*, 1
*Harr. & M'Hen.* 513.   On the *fifth* bill of exceptions he
should contend that the letters of administration were *ipso
facto* void.   He cited *Griffith vs. Frazier*, 8 *Cranch*, 9.   On
the *sixth* bill of exceptions, he cited 2 *Blk. Com. (Tucker's*
edit.) 507, 508, (*ch. 32.*) *Anon.* 12 *Mod.* 441; and *Par-
ker vs. Kett, Ib.* 471, 1 *Vent.* 349.

*F. S. Key*, for *Hepburn* the Appellee.   On the *first*
bill of exceptions.   Conversion is the gist of the action of
trover; and one of the questions in this case is, when did
the conversion here happen?   The plaintiff proved a de-
mand and refusal in 1812.   But it is said that some act of
*Darnall*, many years before administration was granted to
the plaintiff, amounted to a conversion.   The acts of *Dar-
nall* did not amount to a conversion.   They would not
have amounted to a conversion, if there had been at the
time an administration on the estate.   There is no evi-
dence of the change of the intention of *Darnall* as to the
manner in which he held the property.   He declared at
one time, in 1782, how he held it, and he never stated
himself at any time to hold it absolutely as his own.   He
held it to satisfy his claim, and professed himself ready to
deliver it up to the rightful administrator, and until, there-
fore, there was a demand by such administrator, there
could be no conversion.   Conversion is a tort, and to
commit a tort there must be some person upon whom to
commit it.   Here there was no person to be affected by
the tort, there being no administration.   Until there was
an administrator there was no person to sue for the pro-
perty.   The plea of the act of limitation cannot bar where
there is no person against whom limitations can commence.
It could not run against the representatives, because they
could not sue.   4 *Bac. Ab.* tit. *Limitation of Actions*,
(E 5,) 479.   2 *Esp. Dig.* 210, (595,) cites *Wortley vs.
Sandwick, Farresley*, 99.   In *Webster vs. Webster*, 10
*Ves.* 93, the disability lay on the part of the defendant,
and the plaintiff there had a right to sue; and because the
defendant might have been sued as executor *de son tort*, the
Lord Chancellor decided that limitations was a bar.   That
case, therefore, does not support the position for which it
was cited on the other side.

On the *second* bill of exceptions.   As *Darnall* had set
up certain claims against the estate of Miss *Fishwick*, the
account offered in evidence in this exception was offered to
show that he was a debtor to the estate of her father, to
which estate she was entitled, and therefore that those
claims ought not to be deducted; and not for the purpose

for which it is said to have been offered of inflaming the damages.

On the *third* bill of exceptions. This is the only exception upon which there can be the least doubt. The prayer is somewhat vaguely expressed. If it is that *Darnall* took upon himself the executorship, he should have gone on and completed the administration. He could not sell the property to himself; and even if he did administer, he can make out no claim as administrator. He could not retain the property and charge the value to himself. It cannot be presumed, therefore, that he fully administered the estate. There is nothing to entitle the defendant to the presumption that there was a transfer of the property to *Darnall* by the representatives of the deceased, or any settlement of the estate by him, with their assent. There are no circumstances proved to justify such a presumption, but length of time and uninterrupted possession. These it is admitted are *prima facie* evidence, unless repelled by proof. This proof has been given by the plaintiff, and he therefore comes within the opinion delivered by this court on the former appeal. There were two ways of rebutting the presumption, one was to account for the delay in not prosecuting the claim, and the other to prove facts inconsistent with the presumption. Both of these have been done by the plaintiff. The delay was unavoidable, and proceeded from good causes, and is sufficiently explained in evidence. There were *femes covert*, minors, and the parties residing at a distance, &c. among the persons entitled to the estate. These are sufficient excuses. *Eldridge vs. Knott*, 1 *Cowp.* 214. No improper design can be imputed to the representatives for the delay which took place. There can be no pretence for the presumption. The facts are inconsistent with it. No such agreement or assent can be inferred. If there had been an agreement, it would have been in writing, and would have been preserved in the manner the old letters and account produced were preserved. *Muir's* letters in 1782 and 1786, show that there was no such agreement. Mr. *Hepburn's* conversations, just before his death—the evidence of Doctor *Beanes*, showing *Darnall* had informed the defendant of his claim against the estate, and how he was to defend himself, are strong circumstances and proof that there never had been such an agreement. The account exhibited from *Darnall's* books makes no mention of an administration, or any thing about the agreement. The whole evidence goes to prove, that the defendant never thought of any such agreement, but relied solely on limitations. Admitting the evidence would justify the presumption, how does the case stand as to the fair administration of the estate? The father of Miss *Fishwick* bequeathed her a legacy of £200, to be paid on her arrival to the age of 21 years. This sum was never paid by *Darnall*, who married her mother, the executrix of her father. He had then funds in his hands to pay doctor's bills, &c. without holding *Dinah* and her children.

On the *fourth* bill of exceptions. The general principle is that the measure of damages is the value of the property at the time of the demand. But it is said that there were expenses in supporting the negroes. There was no evidence given of any such expenses. The services of the negroes greatly exceeded the expenses of their support. The whole subject was before the jury, and they had a right to deduct what they thought proper.

On the *fifth* bill of exceptions. The letters of administration offered in evidence were under the seal of the court, and cannot be questioned. No parol evidence can be gone into to show how they were obtained. At all events they could not be questioned, unless by way of a plea. The declaration expressly states the granting the letters, and the demand and refusal. The acts of the deputy register are to be considered as the acts of the register, and he had authority from the court to grant the letters.

On the *sixth* bill of exceptions. The claim on account of debts paid, could not be set off in this action of tort. This is not like an action against an executor *de son tort*; there is no sort of connexion between the two cases. If the defendant was sued as executor *de son tort*, he might then claim to be allowed for any money he had paid; but he could not claim for money paid by *Darnall.* An executor *de son tort* for lawful acts, may claim a discount; but for unlawful acts there can be no allowance. He shall not retain the property, and claim to recoupe. *Bull. N. P.* 48. *Toller,* 365. 2 *Esp. Dig.* 211. Therefore, taking this as a suit against *Darnall,* as executor *de son tort,* he could not recoupe.

*Martin,* (Attorney-General,) on the same side. On the *first* bill of exceptions. For a conversion committed of the property by the defendant, he attempts to excuse himself by certain acts of *Darnall;* and because *Darnall* had been guilty of a conversion 30 years before the conversion by the defendant, the defendant claims to be excused his own conversion. Suppose this could avail the defendant if he had pleaded it, yet as he has not pleaded it he cannot set it up as a defence. No person can set up an antecedent conversion to excuse or get rid of a subsequent one. In truth there can be but one real conversion—such a one as terminates the existence of the property, as if a man kills and eats an ox, this is a complete and real conversion. There are other conversions, if the property is not destroyed, to be conversions only at such time as the plaintiff may elect to make them so. So long as the property remains in existence, when the owner chooses to demand it, and there is a refusal, then is there a conversion. No right is changed by the conversion; nor does length of possession change or alter the right. It may bar the action, but the right still remains. The mere claiming of goods is no conversion. The party must dispose of them before he can take advantage of the time when the conversion commenced. 6 *Bac. Ab.* tit.

*Trover,* (B) 679, 680. For a tortious taking without conversion, trover will not lie. If the party intends to bring an action of trover, he must make a demand. There must be an actual conversion after a tortious taking. A verdict in trover and satisfaction amounts to a transfer of the property. The property is considered in law to be in the person injured, for the purpose of punishing the wrong-doer for the trespass, &c. Conversion is the gist of action, and for which damages are recovered. There may be a subsequent conversion, for which the party may recover—as "if a person takes my horse to ride and leaves him at an inn, that is a conversion;" but suppose no action is brought, yet the property in the horse remains, and any subsequent injury may be elected to be sued for. But if the plaintiff elects for what injury he claims damages, his action must be brought within three years after such injury. If the property remains in existence, trover will lie for any injury the party may elect to sue for; but if the existence of the property is terminated, then the conversion is at an end, and the action must be within three years thereafter. Here, no matter how many injuries were done to the negroes in question by *Darnall,* yet the property remained in *J. Fishwick,* or her rightful administrator, and he may bring an action for the injury done by the defendant. Unless there is an action for a total conversion, the property in specie remains in the original owner, and an action may be brought for any after injury. There may be acts done which the party claiming may elect to consider as a conversion. As "if J. S, who lawfully distrained a beast, work it, this is a conversion," and trover will lie; but the working the beast does not destroy the property in it. If he, three years afterwards, sell or kill the beast, the former conversion will not prevent an action being brought then. While the property remains in possession of the person who does the injury, he is liable for any particular injury which the owner may elect to sue for. It is not necessary that the property should continue to remain in the possession of the person injuring it, between the times of committing the two or more injuries. It is not the tortious taking for which the action lies—but the conversion. If a person finds a garment, and wears it, this is a conversion. His duty was to keep it, and not use it, until after a fair presumption, that there was no owner for it. But if there is no demand until three years after the wearing it, yet an action may be brought after a demand and refusal. There can be no conversion unless it be one in reality by a total destruction of the property, wherein the party is not bound to elect. The cause of action accrues on the conversion; and when the party is called upon to restore the property, and refuses, the law presumes that he applied the property to his own use, and it is *prima facie* sufficient evidence of a conversion. *Ball. on Lim.* 96. That there may be subsequent conversions, is established in *Swayn vs Stevens,* *Cro. Car.* 245. *Ball. on Lim.* 97. The action does not

depend upon the length of time the property is out of the possession of the party injured; for though he is out of possession, it is still his property. If the property remains in the hands of the person who committed the first conversion, he may be proceeded against for the second conversion. If the property gets into the possession of another person, after an injury had been committed on it, a recovery may be had against the person who committed the last injury. There is no principle of justice or equity which can militate against this construction. The word *conversion* has led to the mistake into which the appellant's counsel have fallen. When it is rightly considered what is a conversion, there can be no doubt upon the subject, because there may be 100 injuries of the kind which the law considers as amounting to a conversion. 2 *Esp. Dig.* 595. *Wortley vs. Sandwich,* 7 *Mod.* 99. Here it is contended that there was no act, antecedent to the demand and refusal in this action, which amounted to a conversion, and for which an action could be brought, had there been any person who could have brought the action. Before the letters of administration were granted to the plaintiff, there was no person who could claim, and the statute of limitations begins to operate only from the time a right to demand the property vests in some one. 4 *Bac. Ab.* tit. *Limitation of Actions,* (E 5,) 479, (*note* a.) *Curry vs. Stephenson, Carth.* 335. *Joliffe vs. Pitt,* 2 *Vern.* 695. Here the first conversion was on the demand by the plaintiff, and refusal by the defendant, for until then there was no person who could demand and claim for a conversion. Whether *Darnall* was liable to be sued as executor *de son tort* or not, has nothing to do with this case. He could only have been sued by the creditors, and the plaintiff does not claim as a creditor. *Darnall* was as much bound to take out letters of administration as any other person. He claimed as one of the representatives. All the rest of the representatives had sufficient excuses for not administering; but *Darnall* had none. The plaintiff now claims the property, that he may administer it, and do that which ought have been done by *Darnall.* Nothing had taken place to prevent this, as the property is in existence, and unchanged in any manner. The counsel for the appellant has cited *Went. Off. Ex'r.* 49, (125,) for the purpose of showing that the letters granted to the plaintiff must relate to the time of the death of the intestate, so as to let in the plea of limitation in order to defeat the action. Relation is a fiction of law, introduced for the sake of doing justice; but if introduced in the manner contended for in this case, it would work injustice. Relation of the letters of administration to the time of the death of the intestate, is allowed for the purpose of preventing limitations from barring; and it is allowed for the purpose of punishing all intermediate trespasses committed on the property of the deceased, and to enable the administrator to take possession of the property for the purposes of administration,

Letters testamentary have relation to the death of the testator, so as to render void all intermediate acts by the administrator.

On the *third* bill of exceptions. It is supposed that the prayer in this exception was, that although no letters testamentary appeared upon record to have been granted to *Darnall*, yet it might be presumed that they had been granted to him, and that he had fully administered the estate. As there was no will made by Miss *Fishwick*, there could be no letters testamentary granted on her estate, and there is no evidence to justify the presumption that any letters had been granted. There was none in 1782, and there is nothing showing that any had been granted since. But more is here asked to be presumed than could be asked if there was an administration appearing upon record. How can it be presumed that *Darnall* fully administered, when it is in evidence he had property of the deceased in his possession. He could not by paying the debts, keep the property. In 1786 *Muir* denies having ever received any thing; and there was no proof of payment to any of the other representatives. The evidence not only rebuts the presumption that *Darnall*, with the assent of the representatives, administered on the estate, but it proves satisfactorily that there was no such administration.

On the *fifth* bill of exceptions. The letters of administration granted to the plaintiff is conclusive evidence that they were granted in due form of law by the orphans court, and no parol evidence was admissible to show that they had been improperly granted. There was nothing in the manner of granting them by which they could be revoked by the orphans court; and until they are revoked, they are evidence that the plaintiff is the administrator. The decision in *Griffith vs. Frazier*, 8 *Cranch*, 9, was on the ground that there was no power in the persons to grant the letters, as former letters had been granted, and not whether they were improperly granted; and the court decided that when letters were once granted, by a court having competent jurisdiction, and were unrevoked, no new letters could be granted. A distinction is there taken between an erroneous act of a tribunal having competent jurisdiction, and the act of a tribunal having no authority. The case cited sanctions rather than operates against the case before this court.

On the *sixth* bill of exceptions. The object of the prayer in this exception was, that any debts which *Darnall* had paid for Miss *Fishwick* might be deducted from the damages to be assessed in this action. *Darnall* might have claimed such a deduction if the action had been brought against him, and he had paid the debts with his own money, and there was no other property of the intestate, except that in his hands. He may have sold property of the deceased to the amount paid by him. There is strong presumption that the debts were not paid with his

1818.

Fishwick
vs
Sewell

own money. It has been shown that a legacy of £200 sterling was left to her by her father, besides a large balance due his estate from *Darnall* who married the executrix, to which she was entitled. And from *Muir's* letter in 1775 the presumption is, that he paid the debts, for he said he should pay the money due Doctor *Murray*. Where an allowance is to be made to an executor *de son tort*, it is, where the property of the deceased is sold by him, and he accounts for the amount by showing it had been paid away for debts due from the deceased. And this too is only done when he is called on by the creditors of the deceased, and not where he is called on by a rightful administrator. *Toller*, 365. Where the executor *de son tort* retains the property, no such allowance is made. *Bull. N. P.* 47, 48. 1 *Went. Off. Ex'r.* 181, 182. 1 *Ventris*, 349. The cases of, *Anon.* 12 *Mod.* 441, and *Parker vs. Kett, Ib.* 471, do not impugn this principle. But here is no action against an executor *de son tort*—this is an action against a person who never acknowledged he held the property of the intestate, nor had paid debts which he wished to be recouped from the damages. But even if such a deduction could have been made in an action against *Darnall*, the defendant upon no principle of law can claim to recoupe from the damages a debt paid by *Darnall*, when he is sued only in his own right, and not as the executor or administrator of *Darnall*.

*Jones*, (District Attorney of *Columbia*,) in reply. The bill of exceptions, which stands the *fifth* in order in the record, will be first considered; that is, the one which relates to the title of the appellee to appear in this court. If the appellee has right, it has been by the oversight of the persons interested; and if that right should be thought a valid one, it gives to him a title which he had not before. It appears that these letters of administration were obtained by the appellee without any previous notice having been given to the persons interested, and without any citation having issued. In *limine* then, their obtention was a clear and manifest transgression of the testamentary system, from which the powers and authority of the orphans court are derived. Such an open and obvious violation of their powers, that this court are at liberty, nay, they are bound to say, that the orphans court, in the granting of these letters, had no jurisdiction, and therefore that the letters themselves are, to all intents and purposes, void. The jurisdiction of the orphans court is a strictly limited one. The powers of the register are purely ministerial. All the the powers of the orphans court depend on statutory provisions. It is the statute which points out who shall be entitled to administration on intestate's estates. That it shall be first given to the next of kin in a prescribed order, and on their refusal then to the creditors. If neither next of kin nor creditors apply, letters *ad colligendum* are issued to preserve the estate. It is not necessary to travel through

all the powers of the orphans court. It is sufficient for our purpose that they have only jurisdiction in the particular cases given by the statute. The orphans court differs *toto cœlo* from the tribunal we now address. Their powers are tied down by the statute. If they grant administration to any one whom the statute does not entitle to it, they exceed their jurisdiction—they transgress their powers—they act without authority. It is admitted that the judgment of a court of competent jurisdiction is, as to all matters decided by them, final and conclusive; that it can never afterwards be questioned by any other tribunal. But there is a vast and material difference between bringing under review the judgment of a court, in cases where they have jurisdiction, and that of calling in question the acts of a tribunal which have been done through fraud or by a clear transgression of its jurisdiction. It can scarcely be necessary to refer the court, for this purpose, to the case of *The Duchess of Kingston* before the House of Peers, as it must be familiar to them. In the decision of that case, the correctness of a decision of an Ecclesiastical court was involved, and it was determined, that as such decision had been obtained *per fraudem*, it was *ipso facto* void, and the decree of that court was therefore nullified. Here we have an additional reason for vacating the letters of administration granted to the appellee; for besides their having been obtained *per fraudem*, they were illegally obtained; that is, they were acquired *coram non judice*. The court have been referred to the case of *Griffith vs. Frazier*, 8 *Cranch*, 9, not for the purpose of shewing that in all cases the judgments of other tribunals can be brought in issue, but only to shew that where *such judgments are absolutely void*, it is not necessary to go into that court for the purpose of vacating them, but that that object may be effected in a court of appellate jurisdiction. That case came before the supreme court upon a writ of error to the circuit court for the district of *South Carolina*. The court of probate of *South Carolina*, a court in many respects similar to the orphans courts of this state, have the power of granting letters *durante absentia*. A power, however, denied them under peculiar circumstances. To come at the fact whether these peculiar circumstances existed, the appellate court thought itself authorised to make the inquiry, so far as it could be made in the record. And when from the record it appeared that such circumstances did not exist, and of course that the court of probate had granted the letters *durante absentia*, without having had jurisdiction to do so, the appellate court decided that such letters were *ipso facto* void, and gave judgment accordingly, though the legality of the letters was only collaterally brought in issue. To apply that case to the present—It is true that the letters of administration here are *prima facie* evidence that the appellee was entitled to them; but when we examine the record it is obvious that he was not entitled, and that the facts in the case are such as did not give the orphans court

the power of granting them; because the record shews that
there *were others who were entitled*, and that the *requisites*
of the *testamentary system*, under which, and under which
*alone*, the orphans court can act, *have not been complied
with*.   This court are here called on to receive and foster
a monster in legal proceeding; for they are not only requir-
ed to sanction the acts of a court, but of the register of a
court--nay, not the acts of the register, but of the register's
deputy.   The question here indeed seems to be not so pro-
perly whether the orphans court had jurisdiction to issue the
letters, because there is no evidence that the court did grant
them, but on the contrary it is evident that the court did not
grant them, as they were not in session when they were grant-
ed, but whether the orphans court have the authority to trans-
fer their powers and duties to their register.   Are we to
be prevented from calling these letters in question because
they have the seal of office attached to them?   Has a seal
such magic in it that it wraps every thing it touches in mys-
tery?   The orphans could act either judicially or ministe-
rially.   If they act ministerially it is evident that their
proceedings may be inquired into, and that they are not
conclusive.   If they act judicially it is also evident that
though we may not be authorised to inquire, (which is not
admitted,) into the lawfulness of their conduct, yet it by
no means follows that we may not examine into the fact
whether they have acted at all or not—whether the act of
their register is to be considered as their own.   Let
the rolls of this court be applied to for an illustration,
and we ask, if any person *by accident* or *fraud* should, dur-
ing the recess of the court, obtain the seal to a professed
judgment of this court, when no such judgment had ever
been rendered, the party affected thereby would be bound
by it until the judgment had been vacated by writ of error?
Or, whether when the court, by whom it professed to have
been rendered, denied it, and the party was able to prove
undeniably that such court was not in session at the time
when the judgment appeared to have been passed, it could
not be avoided when collaterally brought in issue?   And
that where a person claimed lands purchased under an execu-
tion on such judgment, in the trial of an action of ejectment for
such lands, the opposite party would not be able, by prov-
ing the judgment to have been obtained by mistake or
fraud, to nullify it.   It would indeed be a monstrous ab-
surdity, that a writ of error should lie on a judgment
which never had been rendered.   The most reasonable
way, surely, is to treat such acts as *ipso facto* void.   But
an objection to these letters being declared void, because
they were not granted by the court, but by the register, is
that the court have adopted the practise of so delegating
their authority.   If any such practice existed, it is founded
in absurdity.   But on inquiry none such is found.
However, if its existence was true, this court have to de-
cide on it as if it had been adopted at the issuing of these
letters for the first time, because it is now for the first time

brought under their cognizance. Precedents have no force except in the tribunal by whom they have been established. As the legality of this practice of the orphans court was never previously inquired into by this court, it is, so far as regards precedent, of no more weight, than *if it had* in point of fact commenced yesterday. Where a man dies intestate are his infant children to be put under a guardianship unknown to the law? It is the judges of the orphans court, and they alone, to whom the law is willing to confide this important and delicate trust—men chosen for their high standing in private life, and their knowledge of the laws of the land. Is it to be permitted that the register, or the register's deputy, may say to them, the forms of proceeding are yours, but I will be your Viceroy? No such anomaly can exist—none such can be sanctioned by this court. The case of *Griffith vs. Frazier* is conclusive on this point. There the general jurisdiction of the court of probate was acknowledged, but its exercise in that particular case was declared to be beyond their jurisdiction, and therefore *ipso facto* void. Here the letters of administration would be void if they had been *the act of the orphans court, because by the act of assembly under which only the court have power,* the appellee was not entitled to them. But if he had been entitled, they would be void, not having been granted by the court, but by the register's deputy. The act of congress points out a method, by which only the proceedings in state courts can be certified, so as to be evidence in another state; that is, that the chief judge of the court, in which the proceedings take place, shall certify them. The effect, therefore, of giving validity to these letters would be, that it would make them binding in the state, but not out of it; since the chief judge of the orphans court, in which they appear to have been granted, could not give them efficacy in any other state by certifying them as the act of congress directs, the court not being in session when they were granted.

A point which arises under the *first* bill of exceptions will now be examined—Whether, admitting the letters of administration to have been legally obtained, the appellee is entitled to recover? Here a question of first importance presents itself, which is, whether by statute or common law there is any such thing as acquiring a right to property by length of possession, because if forty years possession will not give a title, no lapse of time can vest one. It will be shown in the first place, that the appellant's possession of the property now in dispute is protected by the act of limitations; and secondly, if limitations do not apply, that the doctrine of presumption affords him an ample defence— a doctrine which has been established for the purpose of supplying the foresight of the legislature. As to the importance of these questions none can doubt. The dispute here is as to the right of property to a negro woman, and her issue, who have been in the appellant's possession—undisturbed possession for forty years. If a possession, for

this length of time will not give a title, on the same principle one acquired in the days of Lord *Baltimore* will not give one. If any person should choose to trace back the title to personal property so far, and finds it to have belonged to an individual of that day, and after searching through the musty records of your orphans courts, discovers either that no administration was ever taken out on his estate, or what (according to the reasoning now relied on,) amounts to the same thing, that there remains no evidence of such an administration, he has only to take out letters himself, and he instantly becomes entitled to all the said property, together with its increase from that day to this, limitations and presumptions to the contrary notwithstanding. If, in a word, the claim of the appellee in this case can be supported, no length of possession can secure a title—nothing can prevent claims like the present from springing up but the hand of time, which buries both property and owner in one common ruin. If the property has been originally wrongfully possessed, and the letters of administration are construed for this purpose as relating back, the first taker not only is made liable, but his representatives *in infinitum;* because if the wrongdoer has no right, and limitations and presumption are displaced, he can give no right to his representatives. But the true and correct principle is, that an administrator is the owner by relation for every purpose, and to every effect. This principle, it will be shown, is established by the true construction of the act of limitations, and by the authority of adjudged cases.

It may be stated generally, on the first branch of this last question, that no court has ever decided since the statute of *James,* or the act of limitations of this state, that limitations do not apply to a case like the present. Let us examine this question on principle. How does an administrator, long after the death of the intestate, claim? Surely by relation back, not for one purpose only, but for every purpose. As to contracts and torts in the life time of the intestate, he represents only the rights which the intestate himself had, and he takes them precisely as he would have done had he administered the day after the death of the intestate. We have only to see, that the cause of action accrued in the life-time of the intestate, and limitations run. The books say so *una voce.* This, however, it is said is a different case, and presents a new question, because here the cause of action did not accrue in the life-time of the intestate, but after her decease. And so in every other case of tort or contract arising after the death of an intestate, limitations, it is contended, only commences from the date of the letters of administration. If this case arises from a tort done after the death of the intestate, it sounds in damages, and it ought to have been laid on a tort done the administrator. The foundation of this case is, that by fiction and intendment, and the doctrine of relation, though the tort here complained of is of fifty years standing, yet the appellee is entitled to sue for

1818.

Fishwick
vs
Sewell.

it, as if it had been of yesterday; or in other words, that a right to sue at all only acquired yesterday, shall be construed back for fifty years. The doctrine of relation should never be called in but to the aid of justice—to give but not to divest rights. The court are called on to make the appellee the administrator of 1775, for some purposes, but for others to keep him to the date of his letters. This is surely not the conduct of even handed justice. The plea of limitations is not a bad plea. Lord *Mansfield* has declared it to be essential to individual justice and protection. Where, let it be asked, is the injustice of saying that this right of the appellee existed forty years ago? Can this court say to the appellee, we will give you all the privileges which the doctrine of relation can give you, but we will take care that you shall be exempted from its disadvantages? Will you take away from the appellant this ægis against vexation—the ægis of the act of limitations? This would be to make stern justice deviate from the dictates of duty. The property now in litigation was, at the death of Miss *Fishwick*, of trivial value. It has swelled into importance by the fostering hand of time. Who, let it be asked, is an administrator or executor? Do they acquire any beneficial right of property in the estates of the deceased? Or are they not bare trustees? And is the beneficial claimant to skulk behind this fiction of law? If there be creditors, or others, beneficially interested, are they not bound to assert their claims; and if they omit to do so, are they not as much guilty of laches as a legal claimant who omits to sue? The legislature, so far as regarded the act of limitations, intended to place the legal and the equitable claimant on the same ground. This, the reason and the spirit of the law alike demanded. What is the difference between a legal and an equitable claimant? Is there any in fact, except as relates to their means of remedy? And are not the means open to the latter as effectual for the recovery of his claim as those which are enjoyed by the former? Most unquestionably they are. Moreover, when we invoke in this case the aid of the statute of limitations, we use it in effect not against the administrator, but against the obsolete claimants. It is to them only it will injuriously apply, and they merit it by having been guilty of laches. From analogy too, and on principles of policy and justice, this court must, when they give the appellee, by the doctrine of relation, the capability of suing, also subject him, by the same doctrine, to the statute of limitations. It will be considered first on authority. It cannot be doubted, because such are the express words of the act of assembly, that a cause of action like the present, may be effectually barred by the act of limitations, where three years have elapsed since it originated, and before the institution of a suit. The distinctions which have been adopted in the construction of this statute, are, if the court will permit the digression, highly singular. For instance, it is said in the books, that the effect given by this statute to length of possession is not to

1818.

Fishwick
vs
Sewell

transfer a right, but only to destroy a remedy. Now it would seem, that where you take away a man's remedy to the recovery of a right, you necessarily divest him of the right itself. For it must be obvious, that in every case where the law gives to the possessor of property the power of defending his possession, whenever he is able to show a certain length of possession, by that circumstance alone, it of course changes the estate he previously had in such property, from an uncertain and precarious one, into one of an absolute and indefeasible nature, and consequently in effect puts to death the right of all other persons to the same. By way of illustration, to what it is feared has been too obscurely stated, we know that to a writ of right sixty years is a bar, and to an action of ejectment twenty years possession is a bar. It is then a maxim in law that every right has its peculiar and fit remedy. In the instances referred to, however, neither the plaintiff in the one, nor the demandant in the other, have any relief for their several claims—the claims themselves, therefore, on the foundation of that maxim, may be said to have expired; and as these claims existed, and might have been recovered at any time before the lapse of the sixty or twenty years, during which period consequently the tenant or defendant held their respective estates by an uncertain tenure, at the end of such period that uncertain tenure is transformed into an absolute estate. When the true, or rather the original owner's remedy is taken away, his right is destroyed. To say that the right exists, although the remedy is lost, is contrary to every principle of common sense. The poet tells us "that you take away my life when you take away that by which I live." And with more truth it may be said that you take from me my right when you take from me my remedy. In order, however, to show that here we cannot avail ourselves of the plea of limitations, we have been told that no cause of action existed previous to the taking out the letters of administration, inasmuch as no species of abuse of property, except its total destruction, can amount to an act of conversion, unless the true owner thinks fit so to consider it; or, in other words, that nothing but a demand and refusal can make a conversion. It is admitted that a refusal is in most cases evidence of conversion, but it is denied that it is more than evidence, or that it is the only evidence. Where one is in the possession of property by the consent of the true owner, it is agreed that there can be no conversion till the true owner demands the restoration of the property, and the possessor refuses to make it. 2 *Esp. Dig.* 203. So where the heir of a person, who had held such a possession, continues to hold, he can be guilty of no conversion until demand and refusal, because the possession was with the consent of the owner. 2 *Esp. Dig.* 210. The court, however, has been referred, by the counsel for the appellee, to *Ball. on Lim.* 97, the case of a ship, for the purpose of showing, that although an act of conversion be once consummated, if there

be a new act of conversion, on such new conversion an action may be brought; and although limitations would be a bar to an action for the first, it will not bar one for the last conversion, if within three years. This court have said, and thereby furnished a complete answer to this notion of the counsel for the appellee, that although the action of trover is not by name included within the act of limitations of this state, it is nevertheless embraced by its general provision for all actions on the case; because it is apparent that if this doctrine of election, if it may be allowed to be so baptised, is sanctioned, that limitations can never be taken advantage of as a relief against an action of trover. It would be to leave it to the election of the plaintiff in all such cases, whether he would be barred by such a defence or not. For notwithstanding he has made a dozen demands of the defendant for the property in dispute, and has met with as many refusals, he has only to make a demand at any time within three years before he institutes his action, and he will thereby have provided himself, if he again meets with a refusal, with a satisfactory answer to the plea of limitations. The act of limitations tells us that no action of trover can be maintained after three years have elapsed from the time the cause of action arose. The court would, by the adoption of this asserted doctrine of election, make the act of assembly "speak the word of promise to the ear, and break it to the hope." The fallacy of the reasoning by which such a principle is attempted to be maintained, consists in mistaking what amounts to a conversion. Was it ever before contended that an unequivocal act of conversion ever left the true owner, except as it regarded his remedy, at liberty so to consider it or not? An election of remedies is intelligible, but an election of conversions is, with all respect to the opposite counsel, absurd and preposterous. No authority whatever can be produced which even looks towards the establishment of such a principle, save only the very respectable authority of the attorney general, by whom it is now asserted. An authority, however, which I cannot avoid thinking we are more indebted for to professional ardour than to sincere conviction. As to the case of the ship, before noticed, taken *pro re nata*, it may be right, or it may be wrong. As an authority in point, whatever be the respect due to it, what does it amount to? Only that if a person commits an act of conversion on property, and afterwards parts with it, and comes a second time into the possession, and again converts it, that he cannot avail himself of limitations if such second conversion be within the limited time. It goes on the assumption, that there can be no second act of conversion where the party continues in the possession of the property. And the decision rests on the fact of the property not having remained in the possession of the defendant from the time of the first conversion to that for which the action was brought. The cases in 6 *Bac. Ab.* 679, 680, as to what amounts to a conver-

1818.

Fishwick
vs
Sewell.

sion, will be now examined. These cases depend, it is apprehended, on the facts, of whether or not the first taking of the property is lawful; and if lawful, whether the right owner puts an end to it by making a demand of the property, or the taker puts an end to it by using it for a distinct purpose from the one for which he received it. For instance, if A lends to B a horse, the first taking here is a lawful one, and A could not sustain an action of trover against B, if nothing else ensued after the original taking; but as soon as he demands of B a return of the horse, and B refuses to make it, *eo instanti* does A become entitled to an action of trover. In such a case demand and refusal would be the only evidence of conversion, because no conversion could possibly have taken place, (supposing B to have used the horse as he engaged to do when he borrowed him,) until such demand and refusal. But if B borrows a horse of A to ride ten miles only, and instead of doing so he travels a hundred miles, this misuse is of itself a conversion, and A could immediately bring his action of trover without a demand and refusal. In this case the first taking was lawful, and became tortious by the malconduct of the defendant himself. The remaining way is, whether A takes a horse from B, without his knowledge, there the first taking is unlawful, and A may either consider it as a trespass or as a conversion; and if he considers it as a conversion, and institutes his action of trover, he may sustain it by proving the illegality of the first taking, without giving in evidence a demand and refusal. The conversion in such a case, therefore, originates with the first unjust taking of the property, and it is then the cause of action arises; and of course it is from that time that limitations run. In the next preceding case in the book referred to, the conversion, and therefore the cause of action and limitations, are to be traced back to the subsequent abuse of the property by the first taker, which being established also supports the action of trover without showing any demand and refusal. In the first supposed case, however, the conversion only arises after demand and refusal, as the first taking was legal, and the subsequent possession not made illegal by the misconduct of the borrower. It is at the time of such demand and refusal that the cause of action originates, and it is at that time that limitations attach. In all those cases the borrower makes himself an adversary holder the very moment he makes, what in law is called a conversion of the property. It will now be shown that this property was in one of the ways mentioned, converted either by the appellant, or by *Darnall,* the person under whom the appellant claims, more than three years preceding the institution of this suit. And as to this fact it appears almost impossible for any mind to entertain the semblance of a doubt; that is, for any mind free from the bias of professional zeal, which frequently leads the best and clearest understandings to the adoption of conclusions which, under other circum-

stances, they would look upon as the mere "coinage of the brain." This zeal having led our learned opponents to controvert the fact which we have ventured to pronounce so perfectly plain, the great respect entertained for any opinion flowing from persons so much esteemed, must be an apology to the court for stopping a moment to make this fact, if it be possible, still more manifest. It has been said that *Darnall*, under whom the appellant claims, was only a fiduciary holder of this property. We admit that he might have been, if he had thought fit, such a holder, because as the friend of Miss *Fishwick* he had the right of collecting and preserving her effects at her decease; but does the proof show that he did so hold this property? But we will go farther, and admit that he did actually in the first instance so receive the property. And it by no means follows that he thereby obtained the right of using it for his own benefit, because the moment such an holder uses or makes profit of the property, that instant he becomes a wrong-doer, and from that period is to be dated the conversion, and consequently the limitations. What then is the proof as to the fact of the use of the property in dispute by *Darnall*, and of his applying it to his individual profit? Does it not appear by the testimony of Doctor *Beanes* and Mrs. *West*, that *Darnall* for twenty years before his death held and claimed *Dinah*, and her descendants, as his own? Was not such subsequent holding, therefore, a manifest act of conversion, even allowing that he originally received possession as a fiduciary holder? In the year 1786, twenty-six years prior to the issuing the letters of administration to the appellee, do we find *Darnall* professing to hold this property in trust only? There is not a scintilla of evidence to such a fact, so that for aught that appears to the court, not even his first taking of the property was fiduciary. Mr. *Muir*, in his letter of 1786, does not demand this negro woman as his own, but asks only for his share of Miss *Fishwick's* estate. In the year 1775 *Muir* thought it useless to administer on the estate, but in 1786 we find by his letter of that date, that he says unless something was shortly done he should be obliged to administer. There is a chasm in the proof from the year 1775 to 1786—as to the facts which intervened we are left entirely in the dark. We have it also in proof that *Darnall* always informed the appellant that this negro woman, and her children, were his own; that the appellant took this property nine years before the bringing of the present action, and that he held it *sui juris* cannot be questioned. To make *Darnall*, therefore, a fiduciary holder of the property, and to show that he remained such until his death, will avail our learned friends but little, unless they can also shew that the appellant received and held the property on the same terms. But to make the appellant a constructive trustee would be not only presuming that which there is no ground to presume, but would be drawing a presumption palpably in the face of the fact. We have thus, as succinctly as we possibly

1818.

Fishwick
vs
Sewell

could, attempted to answer the general reason which our friends say must prevent an action, situated like the present, from being barred by the statute of limitations; that is, because there was no person in *esse* capable of suing before the appellee administered on Miss *Fishwick's* estate. We will now proceed a step farther, and endeavour to satisfy this court, that not only is such an exception unwarranted by reason, but that there is no adjudged case which gives it sanction. To enable the appellee to sue, he is by fiction of law carried back for forty years, and we humbly trust we have satisfied the court, that if he is entitled to the benefit of that fiction, he must be also subjected to all the disadvantages which may be found to attend it. We are told, however, that the reason why this case should be saved from the operation of the statute of limitations, is precisely the same on which all the exceptions, expressly provided for by that statute, will be found to depend. We hope, on the contrary, that the court will think with us, that the very object of the statute demands that its protecting hand should be extended to save a defendant from the grasp of equitable, as well as from that of a legal claimant; and that there is no reason to justify the establishment of a distinction between them. That after time has run with its relentless pace, unappalled by danger, unimpeded by circumstances, and has destroyed in its course, or may be fairly presumed to have destroyed, all evidences of the dealings and transactions between the parties, it would be unjust, unequitable, and against the spirit of the law, to suffer one of those parties, at any remote epoch, to recover a claim against the other, because that claim chanced to be in its origin what is technically styled an equitable, instead of a legal one. Such an exception would obviously be for the benefit of cases of clear laches. Is there then any decided case to tie up the judgment of this court upon the subject? There is none, and this court are left to decide it, unshackled by the shadow of any such authority. The only case in which such a principle is to be found, is the one we have been referred to, of *Curry vs. Stephenson*, in 4 *Bac. Ab.* 479. The case is also reported in *Salkeld* 421, and in *Carthew* 335. The last of these reporters is justly entitled to the reputation he has acquired of accuracy, and it is by him that this case is most correctly stated. But neither in *Bacon, Salkeld* nor *Carthew,* is this principle stated to have been adopted by the court, for the case went off on a demurrer to the replication for the want of a proper conclusion. The principle, on which the appellee's counsel relies, is founded on the dictum of Lord *Holt,* and was not required to be decided by the case before him. Lord *Holt* refers, for the correctness of this dictum, to *Stansford's* case, cited in *Saffin's* case, *Cro. Jac.* 60, 61, and 5 *Co.* 123. No one can deny that Lord *Holt* was a good and estimable judge, but he was not authorised to declare the law *ex carthedra.* What then was the nature of these cases as reported in *Cro. Jac.* and 5 *Coke?*

On turning to them the court will find that neither of them arose on the statute of limitations, but on the statute of fines, under which it was necessary to have an interest in the lands at the time of levying the fine, and because by relation the tenant was carried back to the date of the fine, which struck Lord *Holt* as being an analogous case, he therefore thought himself justified in pronouncing this celebrated dictum, on which, and on which alone, our learned friends can find support. But whether an administrator can be thus carried back to the date of his letters for one purpose, and not for every purpose, remains as yet, in *England*, a moot question, for which the court are referred to the remark of a respectable lawyer, (Mr. *Selwyn*,) to be found in 2 *Selwyn's N. P.* 712, where he says, *it seems* that the time of limitation must be computed from the day on which the letters of administration were granted; and in the *note* 42 he says, this doctrine stands on the single authority of Ch. J. *Holt*. And thus, we trust, we have fully convinced the court that this mighty, this stupendous principle, stands on no other foundation than Lord *Holt's* *dictum*, and that too pronounced when it was rendered totally unnecessary by the case then under consideration, and consequently there is no authority to prevent this court from giving to the subject the free exercise of its own judgment. The opposite counsel, however, fully convinced that the only authority on which they relied would be discovered, on examination, to be but "a baseless fabric," have undertaken to make an excuse for the obvious neglect of the appellee, and those whom he represents; and with this view they have drawn an affecting picture of their poverty and distress, and many other causes which created an almost unsurmountable obstacle to the maintenance of their rights. But on such a picture, and to such reasons, this court cannot *look*. The law alone is their guide, and that they must follow wheresoever it may lead them.

On the *third* bill of exceptions, whether the right of property is not quieted by length of time. The evidence now presented to the court shows a different case from the one before them on the former appeal. It is now proved that Miss *Fishwick* was above the age of 21 when she died. Other facts show, that from 1775 to 1782, there had been no definitive administration or settlement of the estate. Mr. *Muir* in 1775 presumed the estate might be settled without an administration. In 1782 the question was who should administer. *Darnall* was called upon to say what he would do. Nothing between 1782 and 1786 to show what had been done. In 1786 the discussion was to whom *Darnall* had paid the estate, as *Muir* then said he had not received his share. He did not ask *Darnall* by what authority he had paid; but he asks to whom he had paid. This implies that *Darnall* had authority to administer and to pay the estate. The whole question then was, have you administered the estate; have you paid it? In the

last item in *Darnall's* account in 1775, a credit is given for the value of *Dinah.* Here then was a complete conversion. There was either a conventional administration by *Darnall,* or a legal one; and this court would presume a conventional administration to be a legal one, when demanded by the justice of the case. The court will presume a grant, release, fine and recovery, &c. things necessarily matters of record; and if so, it is not asking too much of them, in a case of personal property, after 40 years possession, that they should presume a good title in the holder. It may be remarked *in limine,* that the defendant is not tied down to the presumption asked for in this bill of exceptions. The *third* and *fourth* bills of exceptions taken together, on prayers that the plaintiff is not entitled to recover, will cover any presumption to which the appellant was entitled. It may be inferred that *Darnall* was appointed executor by Miss *Fishwick,* as her full age has been proved. The court may presume she made a will, constituting *Darnall* her executor; or that he might have been her executor in some other way. In *Toller,* 35, and 2 *Went. Off. Ex'r.* 4, a distinction is taken between a universal executor and a special executor. If it is necessary to presume a will or letters of administration it is sufficient. If the presumption is controverted by positive proof, then it is overthrown; but it cannot be defeated by presumptive proof. One presumption cannot drive out another. There may be a presumption against positive evidence, as where a valid deed is presumed, although one is produced which is defective. It is asking nothing against a legal presumption, that the court should presume that Miss *Fishwick* made a will appointing *Darnall* her executor; and although the court cannot believe it, yet as Lord *Mansfield* said, in *Eldridge vs. Knott, Cowp.* 214, "there are many cases where from a principle of quieting possession the court has thought that a jury should presume any thing to support a length of possession." How is the fact that this presumption is asked in the absence of all proof that *Darnall* was the executor or administrator? Is it not strongly implied in *Muir's* letter of 1786, calling upon *Darnall,* as administrator or executor, that he had acted in one of those capacities? The possession too of the negroes by *Darnall.* These circumstances show that it is not in the absence of all proof that the presumption is asked. There is nothing in *Muir's* letters in 1775 and 1782, inconsistent with the fact of their being a will appointing *Darnall* the executor; for he might not choose then to take out letters, although appointed executor. But without letters he could act in all matters, but obtain judgments; and as there were no debts due to the estate, suits were unnecessary. If the court may direct the jury to presume a fact in the absence of all proof, why not do it here where there is proof? But it is said there is opposing proof. What is that proof? It is nothing but the silence of the claimants. The inference drawn, that the claim of *Darnall* to the

property was because of his debt against the estate, is without foundation. No such inference can be drawn from the evidence. His having a debt due to him is a strong circumstance for supposing he administered. For every essential purpose the same parties who existed in 1775, exist now. If *Darnall* was executor *de son tort, he* was liable to be sued by the creditors or distributees. He paid the debts and funeral charges, and took into possession and appropriated all the assets. His account shows what he did. Any one of these acts would have constituted him executor *de son tort.* There may have been other creditors than those whom *Darnall* paid. There is no suggestion that the plaintiff is either a creditor or distributee. The distributees, if they could not sue *Darnall* at law, might have filed a bill in chancery against him; but they omitted to do so. In fine, no case has ever occurred which called more imperiously on the court to interpose.

On the *fourth* bill of exceptions. There can be no question that the raising of negroes, until 25 years of age, is a full compensation for their services. This is an action sounding in damages, and the question is, when did the tort commence? The party had an election of one of two remedies. He might sue for the property, or for damages. In detinue there is no damages for the intermediate value of the property. In an action for a tort the measure of damages is the value of the thing, to be fixed when the damage arose, which is when the tort was committed. In this case the tort was consummated as far back as 1775, or at most in 1782.

On the *second* bill of exceptions. The plaintiff below offered in evidence a partial account of the administration on the estate of *W. Fishwick.* If any account was admitted in evidence it should have been the one showing a final settlement of that estate. The account offered in evidence is not a final, but is an intermediate account—an additional account. The defendant at the trial was taken by surprise; for he could not suppose this account would be produced. He had therefore no opportunity of producing the final account which closed the administration. From the silence of the parties interested in that estate a final account ought to have been presumed. *Darnall* was only an executor in right of his wife, and on her death he was absolved from the administration. The letter in 1782, speaks of the *small* estate left by Miss *Fishwick,* and yet this account was produced to show the large amount of property of which she died possessed, and to resist the prayer of the defendant to recoupe from the damages the debts paid by *Darnall.* Suppose there was a suit for the legacy, it would be no defence to say the legacy was set off against the debts, &c. set up to be recouped from the damages in an action of trover.

On the *sixth* bill of exceptions. The defendant, in order to recoupe from the damages, offered to show that

1818.

Fishwick
vs
Sewell

*Darnall* was entitled, and the defendant as his representative was entitled to the benefits of those acts which *Darnall* had done and performed for the relief of the deceased, and of her estate. This was resisted by the plaintiff, and the court below directed the jury, that under no circumstances could the deductions be made. The general principle is, that the jury may recoupe such payments in the damages. But it is said this suit, not being against *Darnall*, the set-off cannot be allowed. The suit could be brought against the defendant in no other way, taking *Darnall* in the character of executor *de son tort*. He could be sued only as a naked wrongdoer. The record shows that the defendant claims and holds under *Darnall* under a general and particular devise of all the residue of his estate. If he can derive his title in any event, and has privity, he has privity for every purpose. Plain reason, and the common sense of the case show that the defendant is entitled to all the immunities and benefits to which *Darnall* would have been entitled if the suit had been against him. If *Darnall* did not make the payments, that was a question for the jury. But it is said that this doctrine of recouping in damages is entirely applicable to actions by creditors against an executor *de son tort*. It is admitted that *Wentworth* is good authority; but in the single instance cited he has not taken the proper distinction. The case in *Ventris* 349, does not bear out the position contended for on the other side. The general doctrine, as stated in 3 *Bac. Ab. Buller, Toller*, 2 *Blk. Com.* and several adjudged cases in *Carthew* and *Modern Reports*, lay down the doctrine simply as to the form of pleading. Though an executor *de son tort* cannot plead *plene administravit*, yet he may give it in evidence, and nonsuit the plaintiff. It has been argued that he might sell the property, and pay the debts, but it is denied that he can keep the estate, and by paying the debts have an allowance for such payment. The nature of the action against him is for unlawful acts, and if one of his acts is allowed as lawful, why not allow all? The rightful executor, it has been said, must sell the property, and that he cannot keep it, although he has paid debts to more than its value. This would be depriving him of all discretion. Why not permit him to do an act beneficial to the estate? If he does advance his own money in payment of debts, why not permit him to keep the property instead of sacrificing it by a sale, the proceeds of which might not be sufficient to pay half the debts? *Toller*, 238. 1 *Com. Dig.* tit. *Administration*, (B 10,) 341. If the general doctrine is that an executor *de son tort* may pay debts and be protected, he must be protected in paying them in the manner which a lawful executor can do. If a rightful executor can retain, why may not an executor *de son tort?* That which a rightful executor may do, so may an executor *de son tort*. The authorities referred to in *Bull. N. P.* 48, go to sustain the general principle, that payments made by an exe-

1818.

Fishwick
vs
Sewell

cutor *de son tort* shall be recouped in damages. But it seems that *Buller* doubts if this could be done in an action by the rightful executor against the executor *de son tort*. *Toller*, 365, is to the same effect, referring to *Buller N. P.* and *Parker vs. Kett*, 12 *Mod.* 471; and the last is one of the strongest cases to show that it may be done. But the authority of *Whitehall vs. Squire, Carthew,* 103, is full that on the general issue in trover an executor *de son tort,* although he cannot plead payments, may have them recouped in damages. This case shows that if he pays debts equivalent to the value of the property, he can keep it. But 2 *Blk. Com.* 507, is conclusive upon the subject. The doctrine of the writer is not to be impeached without imputing to him what never has been done. He lays down what is the general principle, after taking a view of all the authorities, and affirms the doctrine we contend for, and says that which was justifiable in a rightful executor would be so in an executor *de son tort,* except retaining for his own debt.

The opinion of the Court was delivered by

CHASE, Ch. J    The court are of opinion, on the *first* bill of exceptions, that no right of action vested in any person to sustain an action of trover for negro *Dinah,* and her descendants, before letters of administration were granted to the plaintiff in this suit; that the act of limitations could not begin to operate before letters of administration were taken out, and that the act of limitations did not attach until the demand and refusal, proved to have been made on the defendant on the 16th of June 1812. The court are of opinion, that the act of limitations is no bar in this suit, and they concur with the court below in refusing to grant the prayer, and to give the instruction to the jury, as expressed in the *first* bill of exceptions.

The court also concur with the court below as to the opinion expressed in the *second* bill of exceptions.

The court are of opinion, on the *third* bill of exceptions, that the proof offered by the defendant, when contrasted with the proof on the part of the plaintiff, does not warrant the said presumption; and this court concur with the court below in refusing to give the opinion and direction as prayed on the part of the defendant, and stated in the *third* bill of exceptions.

The court are of opinion, on the *fourth* bill of exceptions, that the plaintiff is entitled to recover damages to the amount of the value of *Dinah,* and her descendants, named in the declaration, together with damages for the detention from the time of the demand and refusal proved in this case; and the court below were right in their refusal to give the opinion and directions as stated in the *fourth* bill of exceptions.

The court are of opinion, on the *fifth* bill of exceptions, that all that evidence offered and mentioned in the statement of facts in the said exception in the following words,

1818.

Fishwick
vs
Sewell

to wit: "That the said letters were granted to the plaintiff by one of the deputies in the office during the recess of the court, and in the absence of the witness. And the defendant thereupon swore *J. Burch*, the deputy who had granted the said letters, who stated that the said letters of administration were granted by him in the recess, and without the authority of the orphans court made known to him by the court in that particular case, but according to the usual practice of the office, which practice was known to and approved by the court. And the records of the said court were produced, whereby it appeared that the said court was not in session on the day of issuing of the said letters of administration to the plaintiff, and it did not appear that any application for said letters was made to the said court. But the plaintiff had applied to the register, during the recess of the court, some weeks before the granting the same, for letters of administration on the said estate," was illegal and inadmissible; because the direct tendency of such evidence was to impeach and nullify the said letters of administration, by showing that they were not granted by the orphans court of *Prince-George's* county, but by a deputy clerk in the office of the register of wills of that county, to whom the court could not delegate any such authority. That the said letters of administration were legally efficient until revoked, being clothed with all the requisite legal solemnities to communicate power and authority to the plaintiff to administer on the estate of *J. Fishwick;* and this court concur with the court below as to their admission of the preceding part of the evidence stated in this bill of exceptions.

The court concur with the court below as to the opinion expressed in the *sixth* bill of exceptions, this court being of opinion, that the said claims cannot be recouped in damages in this case, inasmuch as the defendant claimed the negroes in his own right, and in opposition and disclaimer of the trust under which they were transmitted to him; and inasmuch as the same can be adjusted on a final settlement of the estate of *J. Fishwick*, if the parties should elect to go into such adjustment.

It appears by the evidence, that *R. Darnall* was the father-in-law of *J. Fishwick*, having married her mother, who was living when *J. Fishwick* died. That *J. Fishwick* lived with her mother and father-in-law, and died in his house, was possessed of *Dinah*, and a spinet, at the time of her death. From the evidence it is fairly and justly to be presumed that *Darnall*, consistent with his moral duties, possessed himself of the property of *J. Fishwick* as curator, to preserve it for the benefit of her creditors and representatives. That this fiduciary possession continued during his life; for at no time did he manifest, by his words or conduct, any intention to administer on her estate, but was particularly solicitous that some other of the legal representatives should administer. That *Darnall*, as a creditor, as one of the legal representatives, and as the hus-

1818.

Fishwick
vs
Sewell

band of the mother of *J. Fishwick*, and being best ac-quainted with her affairs, was best entitled to the admi-nistration; but he pertinaciously adhered to his resolution, during his life, not to burthen himself with the adminis-tration, and determined to hold the property subject to the claim of her creditors and legal representatives.

It is apparent that it was as much the duty of *Dar-nall* to administer as any of the representatives, and no blame or neglect can be imputed to them which will not equally attach to him for the delay, and no inference from thence can be made in his favour. And these circumstan-ces, combined with other facts in the case—such as there being no will, or proof that *Darnall* claimed as executor, preclude the presumption that he acted as executor, and fully administered the estate by paying debts, &c. That the defendant's title to *Dinah*, and her descendants, is de-rivative, being transmitted to him under the will of *Dar-nall* as residuary legatee, and he held them subject to the same trust that *Darnall* did, until the time of the demand and refusal.

A trustee cannot avail himself of the act of limitations; and it requires plain, strong, and unequivocal proof of his renunciation of the trust to divest himself of it for the purpose of benefiting himself by the act of limitations, to destroy the rights and interest of the *cestui que trust.*

Length of possession is the strong fact on which the presumption was prayed. The possession is accounted for by the proof, which shows how it was acquired by *Dar-nall*, how continued, and how transmitted to his represen-tatives, not inconsistent with his moral duties, his probity or honour, nor in derogation of the rights and interest of the creditors and legal representatives of *J. Fishwick*, but for the preservation of the property for the benefit of her creditors and legal representatives. And by this proof is the presumption most conclusively repelled.

The defendant, as the representative of *Darnall*, as trustee or fiduciary possessor of *Dinah*, and her descend-ants, on an equitable adjustment of all rights, will be en-titled to an allowance for all expenses incurred by him in maintaining and clothing *Dinah*, and her descendants, and for all monies due or paid on her account, on accounting for the use and possession of *Dinah*, and her descendants, and all profits and benefits resulting therefrom, to the time of the demand and refusal. In this way the characters of all concerned will stand unimpeached, and justice will be administered on the broad basis of equity.

JUDGMENT AFFIRMED.